## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | **Chapter 7** |
| VALLEY BUILDING & CONSTRUCTION CORP: | | |
| Debtor. | : | **Case No. 06-16119 (JKF)** |
| ———————————————— | | |
| HOWARD GLASSMAN, Trustee of Valley Building & Construction Corp., | : | |
| Plaintiff, | : | |
| v. | : | |
| WILLIAM O'BRIAN, | : | **Adversary No. 08-0080** |
| Defendant. | : | |
| ———————————————— | | |

## MEMORANDUM OPINION

The Chapter 7 Trustee of the estate of Valley Building & Construction Corp. (the "Trustee") commenced this adversary proceeding by filing a two-count complaint against the defendant, William O'Brien, Esquire ("O'Brien").  Count I of the complaint asserts a claim for the avoidance of alleged fraudulent transfers totaling $13,000.00 (made within two years of the petition date) under § 548 of the Bankruptcy Code.  Count II asserts a claim for the avoidance of fraudulent transfers totaling $14,733.20 (made within four years of the petition date) under the Pennsylvania Uniform Fraudulent Transfer Act ("the PUFTA"), 12 Pa.C.S.A. § 5104.  The basis of the Trustee's claims is that the Debtor paid O'Brien for legal

services which he provided to the Debtor's two shareholders, namely Roy and

Barbara Hiser (collectively referred to hereinafter as "the Hisers"), and not to the

Debtor. The trial of this matter was held on March 16, 2010.  At the trial, the

following three witnesses testified: (i) Allen Wilen whom the parties stipulated was

an expert in bankruptcy valuation and forensic accounting; (ii) Roy Hiser; and (iii)

O'Brien.  Upon consideration, the Court finds in favor of O'Brien.  Judgment shall

be entered against the Trustee and in favor of O'Brien.


## BACKGROUND

Valley Building & Construction Corp. (the "Debtor") filed a Voluntary

Petition for Relief under Chapter 7 of the Bankruptcy Code on December 28,

2006, because its business was negatively impacted by the downturn in the

housing market.  See Docket Entry No. 1, Bankruptcy Case No. 06-16119; see

also Transcript, dated March 16, 2010 ("Tr.") at 105.  The Hisers own 51% and

49% of the Debtor's stock, respectively.  Id. at 24.  In addition to being a

shareholder of the Debtor, Roy Hiser was an officer of the Debtor.  Id. at 104.

The Debtor's business was construction.  As part of its business, it

performed pre-construction activities.  Id. at 95-96. The only attorney whom

Debtor hired to assist with its pre-construction activities was O'Brien who

specializes in real estate work.  Id. at 96, 141.  According to Hiser, pre-

2

construction work on a project consists of "permitting, zoning, engineering [and] architectural" matters. Id. at 88.

On December 28, 2010, Debtor filed its Schedules (except for Schedules I and J) and its Statement of Financial Affairs. See Docket Entry No. 1, Bankruptcy Case No. 06-16119. Debtor's Summary of Schedules and Schedule A reveal that Debtor owned no real property. See Exhibit P-8.

### THE DEBTOR'S INSOLVENCY

The Trustee retained Wilen to determine whether the Debtor was insolvent in 2003 through 2006. Wilen's testimony and expert report established that the Debtor was insolvent "since at least December 31, 2003." Exhibit P-1.

### FOUR PROJECTS BY THE DEBTOR FROM 2003 TO 2006

From 2003 to 2006, Debtor worked on approximately four projects. Tr. at 33. These projects were: (i) the Shurs Lane project which was also known as 4093 Manayunk Avenue; (ii) the construction of a single home at 251 Gay Street in Manayunk; (iii) the DuPont Avenue project which was also known as the Roxborough Lumberyard project; and (iv) the Blair Meadow project which was also referred to as Shawmont Avenue project.[1] Id. at 33-35, 54. The Shurs Lane,

---

[1] There was also a potential fifth project involving real property at 621 Wigard Avenue; however, this project never got underway. Nevertheless, O'Brien provided legal services to the
(continued...)

Dupont Avenue and Blair Meadow projects all involved the construction of townhouses. Id. The Blair Mill project was never constructed. Id. at 35, 54.

According to Roy Hiser, O'Brien provided legal services relating to: (i) zoning issues; (ii) right of way matters; (iii) hearings with the Department of Licenses and Inspection; (iv) permits; and (v) deeds. Id. at 55. He also assisted the Debtor in resolving a dispute which it had with a subcontractor. Id.

### Shurs Lane/4093 Manayunk Avenue Project

The Hisers purchased the property at 4093 Manayunk Avenue for the Manayunk Avenue project from Bell Telephone. Id. at 73. O'Brien did not represent the couple in the purchase of the property. Id. at 86. At the time of the purchase, no site or building plans existed so no zoning or building permits had been obtained for the project. Id. at 73. O'Brien provided services for permit acquisitions; he also did zoning and community relations work for the project. Id. at 87. All of the aforementioned work was done before construction on the project was started. Id. at 87.

The Hisers took out a construction loan to finance the construction of the townhouses for the Shurs Lane project. Id. at 36-37, 43, 86. When the

---

[1](...continued)
Debtor in conjunction with the project and one of the invoices which he sent to Roy Hiser during the relevant time period included fees for his legal work on the project. The details of O'Brien's legal work in conjunction with the property at 621 Wigard Avenue are discussed later in this section under the part labeled "Invoices/Bill of Costs Sent by O'Brien from 2001 to 2006."

townhouses were sold (after their construction), they were sold by the Hisers. Id. at 40. O'Brien did not represent the Hisers in these sale transactions. Id. at 89.

### 251 Gay Street Project

As noted above, the Gay Street project was the construction of a single home. Id. at 86. The Hisers purchased the real estate for the project from Tim Downey and O'Brien. Id. at 87. *At the time of the purchase, no site plans or building plans had been drawn and no zoning or building permits had been obtained.* Id. at 88. Debtor did the construction on the project. Id. at 69-70, 88. Before construction of the home began, O'Brien did the legal work for the pre-construction phase of the project. Id. at 88.

### DuPont Avenue/Roxborough Lumberyard Project

The DuPont Avenue project was the construction of ten townhomes at 446 DuPont Street. Id. at 34-35. The Debtor did the construction work on the townhomes. Id. at 34. The property at 446 DuPont Street was originally owned by Fairway Building Developers, LLC ("Fairway"), which was formed by Walt Lewis and Bruce Tinneny. Id. at 74, 90-91.[2]

Fairway borrowed $2.6 million from Independent Mortgage Company to cover the construction costs for the project. Id. at 45-46, 68, 91. Fairway also

---

[2] Walt Lewis and Bruce Tinneny were the owners of Roxborough Lumber, Inc. Tr. at 90. They were members of Fairway Builders, LLC. Tr. at 90. However, Fairway's sole principal was Roy Hiser. Tr. at 31; see also P-17, at pg. 28 (identifying Roy Hiser as the sole member of Fairway).

entered into an Open-End Mortgage and Security Agreement, dated July 1, 2005, for 446 DuPont Street in Philadelphia, Pennsylvania, as security for the $2.6 million construction loan. See Id. at 45; see also Exhibit P-17. Fairway also borrowed $574,184.00 from Bruce Tinneny, who was also part owner of the property, for the Dupont Project. See Tr. at 48; see also Exhibit P-19. A Promissory Note, dated July 1, 2005, evidences the loan. See id. Fairway entered into a Mortgage and Security Agreement, dated July 1, 2005, with Bruce Tinneny as the lender, granting him a mortgage in the property at 446 DuPont Street, Philadelphia, Pennsylvania. See Exhibit P-18.

At some point along the way, ownership of 446 DuPont Street changed hands either through Roy Hiser's purchase of Lewis' interest in Fairway or by the Hisers buying the property. Tr. at 91. The record is unclear and very confusing on this point. Apparently, there was a plan at one point for the Debtor to purchase the property but, before the deal went through, the decision was made, for unexplained reasons,[3] to have the Hisers purchase the property instead. Id. at 92-95; 111-13; see also D-2 (A through D). Documentary evidence was submitted during the trial showing that O'Brien had drafted and presumably sent by e-mail to Walt Lewis an agreement of sale for the property at 446 DuPont

---

[3]  Roy Hiser testified: "Probably what happened is we – it started out as Valley Building; every went along as Valley Building and somewhere along the line came a roadblock that we had to change it over to Roy and Barbara Hiser." Tr. at 111.

Street with Fairway identified as the seller and Debtor as the purchaser for the deal. Exhibit D-2 (A through D).

Fairway retained the Debtor to develop the DuPont Street project; however, Debtor rejected the contract in its bankruptcy case. Tr. at 46-47. Nevertheless, for reasons not revealed on the record, Debtor completed construction of the townhomes for the project and the homes were sold to third parties. Id. at 100. O'Brien was not involved in the sales of the townhouses to the homeowners. Id. at 100-101.

### Blair Mill/Shawmont Avenue Project

The Blair Mill/Shawmont Avenue project was supposed to be the construction of eight townhomes at 462 Box Elder Lane in Lafayette, Pennsylvania 19444. While Roy Hiser testified that he was not 100% certain of who owned the real property, he believed that it was owned by himself and his wife. Id. at 35. Interestingly, the documents pertaining to this project show that Shawmont, LLC, borrowed $200,000 from Frederick Oskanian in connection with the project. Tr. at 51-52, 54. In exchange, Shawmont, LLC signed a Demand Note, dated June 15, 2005, for the loan. Id.; see also Exhibit P-20. The Demand Note is signed by Roy Hiser on behalf of Shawmont, LLC. Id. A Mortgage and Security Agreement, also dated June 15, 2005, in favor of Oskanian identifies the borrowers of the $200,000 loan as the Hisers and contains both Mr. and Mrs. Hiser's signatures. Tr. at 53. The property which is the subject of the

7

Mortgage and Security Agreement is 462 Box Elder Lane in Lafayette,

Pennsylvania 19444 which, at the time, was the Hisers' residence. Tr. at 53; see

also Exhibit P-21.[4]

The townhomes for the Blair Mill project were never built because a

foreclosure proceeding was instituted involving 462 Box Elder Lane. Tr. at 35, 66

(Roy Hiser). However, Debtor performed pre-construction work on the project for

approximately three to four years. Id. at 97. The pre-construction work included

working with the state on environmental issues and stream crossings. Id. at 97.

---

[4] At the trial, O'Brien offered the following testimony regarding the documents relating
to the $200,000 loan which Shawmont, LLC, borrowed for the Shurs Lane project:

> I prepared both of these documents [referring to the Demand
> Note which is Exhibit P-20 and the Mortgage and Security
> Agreement which is Exhibit P-21] and can tell you why there's a
> difference between the obligor and the mortgagor. The mortgagor
> owned the real estate, and the real estate was security for the
> loan. The demand note was in the name of Shawmont LLC
> because it was anticipated that title to Blair Meadow was going to
> go into Shawmont LLC. In fact, I have - - not with me, but I saw
> earlier this morning a title report issued
> to Shawmont LLC. Agin, this is part of the process. This is not
> unusual. It depends on what lending officer you're dealing with
> and what marching orders they have. Maybe they don't want an
> entity to own it. Maybe they want individuals to own it. Maybe
> they don't want a transfer; maybe the bank would prefer to see - -
> keep the same entity in title and just purchase the interests of that
> entity. Some of these decisions aren't up to Roy Hiser,
> individually or as an officer of [the Debtor]. They're frequently
> driven by a lender. Doesn't change the fact that the relationship
> that I had was with Roy Hiser doing development work on behalf
> of Valley.

Tr. at 146.

<u>Pre-Construction Work on the Projects</u>

O'Brien testified that he performed pre-construction work for the Debtor.

Id. at 142. He explained generally that, in some instances, pre-construction work

is started prior to purchase of the real property upon which the project at issue is

to be built; in other cases, all of the pre-construction work might be done after the

property is purchased.  Id.


**INVOICES/BILL OF COSTS SENT BY O'BRIEN FROM 2001 TO 2006**

During the period beginning January 5, 2001 to March 3, 2006, O'Brien,

using the fictitious name of Manayunk Law Office which was owned by O'Brien &

Associates, P.C.,[5] sent eight invoices and one bill for costs to Roy Hiser.  Id. at

129, 142; Exhibit P-23.  The invoices, in order of their dates, are the following:

| Date | Amount | Regarding |
|------|--------|-----------|
| March 5, 2003 | $921.00 | 4093 Manayunk Avenue |
| May 8, 2003 | $1,191.25 | 4093 Manayunk Avenue |
| February 20, 2004 | $1,733.20 | 251 Gay Street |
| April 26, 2004 | $1,522.26 | 4093 Manayunk Avenue |
| July 14, 2004 | $3,119.36 | Blair Meadow Phase II |
| September 13, 2004 | $2,041.06 | Blair Meadow II |
| March 3, 2006 | $53.25 | 446 Dupont Street |
| March 3, 2006 | $1,241.45 | Miscellaneous Matters |
| March 3, 2006 | $13,967.15 | Blair Meadow Phase II |

Exhibit P-23.  The total amount of the eight invoices is approximately $35,000.  In

the eight invoices and the bill for costs, there is no mention of the Debtor.  Tr. at

---

[5] The trade name Manyunk Law Office is now owned by Oblex, P.C.  Tr. at 126.

130-31. According to O'Brien, he was paid in full for the invoices and the bill for costs. Id. at 131.

O'Brien sent the aforementioned invoices and bill to the Trustee in response to a request for the production of documents from him. In the letter wherein O'Brien enclosed the invoices, he stated:

> In response to the Trustee's Request for Production of Documents, I enclose copies of eight (8) Bills for Professional Services and one (1) Bill for Costs Advanced. The services were rendered and costs incurred, for Roy Hiser, for the period January 5, 2001 through March 3, 2006. I believe all invoices were paid by check; however, I do not retain copies of client checks. No bills were issued to Valley Building & Construction Corp.

Exhibit P-23 (underlining added for emphasis). At trial, O'Brien explained that, when he initially met with Roy Hiser, Hiser was wearing a shirt that had the name Valley Building & Construction on it and that Hiser told him that he "had Shurs Development, LLC." Tr. at 128-29. At their initial meeting, Hiser told O'Brien about his plans regarding the Shurs Lane project. Id. at 128-29. After meeting with Hiser, O'Brien verified through on-line research that Hiser was both an officer of Valley Building & Construction and a member of Shurs Development, LLC. Explaining the reason that he addressed his bills to Roy Hiser rather than the Debtor, O'Brien testified:

> [F]rom my first invoice all the way through, I issued them to Roy Hiser, covering my bases. I have, in the past, been burnt on issuing an invoice to a corporation which

10

> wound up to be a shell and I couldn't collect against the
> individuals because I never invoiced the individuals.
> Mr. Hiser, I believed, as a member of the LLC, as an
> officer of the corporation, would have liability for those
> two entities for services rendered.

Id. at 129.

Three of the bills, dated March 5, 2003, May 8, 2003 and April 26, 2004,

reference 4093 Manayunk Avenue which was the Shurs Lane project. Id. at 62;

see also Exhibit P-23. There is no mention on the invoices of the Debtor. Id; see

also Exhibit P-23. The services listed on the March 5th and May 8th bill were for

pre-construction activities. Tr. at 88-89. The April 26th bill was for services

rendered after construction started. Id. at 89. The reference in the April 26th bill

to deed preparation was for the preparation of deeds dividing one large plot of

land into smaller plots so the deeds run from the owner of the land to the owner

of the land. Id. at 64-65. The deed preparation did not pertain to the sale by the

Hisers to the third party purchasers of the townhomes. Id. at 89. Nothing on the

April 26th bill refers to O'Brien representing the Hisers individually in the sale of

the townhomes to third parties. Id.

Three other bills, dated July 14, 2004, September 13, 2004 and March 3,

2006, from O'Brien to Roy Hiser reference the Blair Meadow/Shawmont Avenue

project. Id. at 65-67; see also Exhibit P-23. Another bill, dated March 3, 2006,

from O'Brien to Roy Hiser references the DuPont Aveue project which was the

construction of ten townhomes. Tr. at 68; see also Exhibit P-23. As stated

11

above, the plan was initially to have the Debtor purchase the property for the Dupont Avenue project but, somewhere along the way, the decision was made to have the Hisers purchase it. Tr. at 110-113. Hiser could not testify as to what percentage of the March 3, 2006 bill included work for the Hisers as opposed to the Debtor. Id. at 114.

Another bill, dated February 20, 2004, from O'Brien to Hiser references the Gay Street project. Id. at 89; see also Exhibit P-23. The services listed in the bill pertain to pre-construction work for the project. Tr. at 89-90.

Lastly, there was a bill, also dated March 3, 2006, from O'Brien to Hiser which references three matters, namely the Wigard Avenue project, the Gay Street project and the Tisosky matter. Id. at 69; see also Exhibit P-23. O'Brien could not divide the amount of professional fees listed on the bill ($1,012.50) among the three matters; although he recalled that his bill did not reflect the amount of time that he had devoted to these three matters because he had under-billed for them. Tr. at 137-38. According to Roy Hiser, the Wigard Avenue project "was for a proposed housing development" but nothing happened with it; only some investigatory work was done with regard to the project. Id. at 69. Bruce Tinneny and Walter Lewis owned the property at 621 Wigard Street. Id. at 98. O'Brien drafted a letter to these men on behalf of the Debtor regarding the purchase of the property. Id. at 99; see also Exhibit D-4(A). He also drafted an agreement of sale for the Debtor for the purchase of 621 Wigard Street property

from these men.  Tr. at 99; see also Exhibit D-4(B).  The agreement of sale was never executed.  Tr. at 99.

At trial, O'Brien offered the following testimony wherein he: (i) refers to the e-mails that demonstrate that the original plan regarding this project was for the Debtor to purchase the Wigard Avenue property; (ii) also explains that the legal work which he performed on the project was done for the Debtor in anticipation of the construction work which it would do for the project; and (iii) states that it is a common practice for him to do legal work on behalf of a developer before construction of a project ever gets underway:

> We saw the exchange of e-mail between Roy Hiser, as an officer of [the Debtor] saying let's — here, let's negotiate this deal.  As it turned out, there were transactional reasons, tax reasons not to go through a change in title.  They're not relevant to this proceeding, but it made sense.  It doesn't change the fact that Valley Building contacted me and said let's get going, which means we're going to do the plans, we're going to  - - in that case, it was purchase the - - the plans had already been done.  Mr. Hiser didn't recall, but one of the reasons Mr. Hiser found that property attractive is that all the subdivision work had been done by Messrs. Tinneny and Lewis so that when he purchased it, there was already a zoning permit in place.  And Mr. Hiser used the lead time from negotiating the sale, which again, was introduced and initiated by him as an officer of [the Debtor] – used that lead time between closing the agreement and settlement to get construction plans drawn.  So that by the time he closed in July 2005, he was ready to hit the ground running.  There was a lot of work to do between those dates to get it done, and they were all development-related.  You know, the trustee makes a distinction that simply does not exist in this

13

> case, the developer doesn't own it, the developer can't
> pay the bill. Well, I've paid - - developers pay me all the
> time. They don't own the property, but they ask for
> services, get the benefit of those services, and incur,
> therefore, an obligation to pay for those services.

Tr. at 144-45. The Trustee provided no testimonial or documentary evidence to

contradict O'Brien's evidence that the legal work which he did in conjunction with

the Wigard Avenue project was performed on behalf of the Debtor.

According to Roy Hiser, the services listed on the March 3rd bill for the Gay

Street project have nothing to do with O'Brien representing the Hisers in the sale

of the property to a third party. Id. at 90. The services listed on the bill dated

March 5, 2003 reference this pre-construction work for the Gay Street project.[6]

Id. at 88-89.

The Tisosky matter was a small litigation matter involving the Debtor. Id.

at 70. Tisosky was a subcontractor whom the Debtor hired to do drywall work on

a project. Tr. at 108. The Debtor was "sued or at least challenged because there

were some bills outstanding[.]" Id. The work was not performed as the Debtor

had requested and the Debtor cancelled its contract with Tisosky. Id. at 108-09.

Tisosky filed a claim against the Debtor in small claims court; the matter ended

up being settled. Id. at 109.

---

[6] Before any construction could commence on the Manyunk Avenue, DuPont Street or
Gay Street projects, zoning and building permits had to be obtained. Tr. at 72-72.

## PAYMENTS FROM DEBTOR TO O'BRIEN FROM
## MARCH OF 2004 THROUGH SEPTEMBER OF 2006

During the period beginning in March of 2004 through September of 2006,

Roy Hiser signed the following checks, made payable to O'Brien, on the Debtor's

checking account:

| Check Date | Clear Date | Check # | Check Amount |
|------------|-----------|---------|--------------|
| 03/03/04 | 03/08/04 | 2861 | $1,733.20 |
| 11/14/05 | 11/22/05 | 3235 | $2,000.00 |
| 03/03/06 | 03/07/06 | 3326 | $2,500.00 |
| 03/30/06 | 04/03/06 | 3353 | $1,500.00 |
| 04/06/06 | 04/17/06 | 3365 | $1,000.00 |
| 04/20/06 | 05/02/06 | 3378 | $1,000.00 |
| 05/04/06 | 05/10/06 | 3390 | $1,000.00 |
| 05/16/06 | 05/23/06 | 3396 | $1,000.00 |
| 07/28/06 | 08/01/06 | 3431 | $1,000.00 |
| 08/05/06 | 08/08/06 | 3434 | $1,000.00 |
| 09/29/06 | 10/03/06 | 3472 | $1,000.00 |

Exhibit P-22.[7]  See also Tr. at 56-61.   The total amount of these checks is

$14,733.20.[8]  O'Brien endorsed the checks and deposited them into the bank

account owned by O'Brien & Associates, P.C. Id. at 127.

-------------------

[7] Notably, the only payment amounts which match up with the amount of an invoice or a notation on the invoice are the following two checks: (i) the check dated March 3, 2004 (for $1,733.20 which is the amount of invoice from O'Brien dated February 20, 2004); and (ii) the check dated November 14, 2005 (for $2,000 which is noted as a credit on O'Brien's invoice dated March 3, 2006 for $13,967.15.  There is another notation on the same invoice (the one dated March 3, 2006 for $13,967.15) of a payment made on or about June 6, 2005, for $1,000.00 but it does not correspond with any of the check or clearing dates listed above.  The amount of seven out of the eleven checks listed above is $1,000.  All but one check is in a rounded amount which suggests that the payments do not have any relation to the amount billed in a particular invoice since the amounts listed in O'Brien's invoices are completely varied and none of them are in the amounts of $1,000, $2,000 or $2,500.

[8] The $14,733.20 in payments does not cover the total amount of the eight invoices listed above, dated from March 5, 2003 to March 3, 2006, which O'Brien sent to Ron Hiser.  As noted above, the total amount of the invoices is approximately $35,000.00.  Nevertheless, O'Brien testified that it was his belief that he was paid in full for the invoices. Tr. at 133-34. No testimony or evidence explaining this discrepancy was introduced.

15

When Roy Hiser was asked why he made payments to O'Brien rather than other creditors from whom he was also receiving bills on behalf of the Debtor, Hiser stated that he had an on-going need for legal work and would not expect an attorney to provide additional legal services unless he had been paid for his prior work. Tr. at 108. Hiser further testified that he considered the amount which he was billed on the invoices at issue worth the value of the legal services which O'Brien performed. Id. at 108.

O'Brien testified that he has never done any personal legal work for either of the Hisers. Id. at 101, 142. O'Brien further testified that he never had any dealings with Barbara Hiser. Id. at 142.

## DISCUSSION

The Trustee alleges that the payments which the Debtor made to O'Brien during the two year look back period should be avoided under the actual and constructive fraud provisions of §548. Seeking to re-capture an additional payment of $1,733.20, the Trustee also asserts that the payments which the Debtor made to O'Brien during the four year period prior to the filing of its bankruptcy case should be avoided as fraudulent transfers under the actual and constructive fraud provisions of the PUFTA.

### (I) Actual Fraud

The actual fraud provision of §548 provides:

16

> (a)(1) The trustee may avoid any transfer . . . of an
> interest of the debtor in property . . . that was made . . .
> within 2 years before the date of the filing of the petition,
> if the debtor voluntarily or involuntarily--
>
> (A) made such transfer or incurred such obligation
> with actual intent to hinder, delay, or defraud any entity
> to which the debtor was or became, on or after the date
> that such transfer was made or such obligation was
> incurred, indebted[.]

11 U.S.C. §548(a)(1)(A).  The actual fraud subsection of § 5104 of the PUFTA

similarly provides:

> (a) General rule.– A transfer made or obligation
> incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the
> debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay or defraud
> any creditor of the debtor[.]

12 Pa.C.S.A. § 5104(a)(1).[9]  See also McNamara v. PFS (In re The Personal and

Business Insurance Agency), 334 F.3d 239, 242 (3d Cir. 2003) (noting that the

language of the PUFTA "mirrors" that of §548 of the Code).

Under both of these actual fraud provisions, the Trustee bears the burden

of establishing that the Debtor made the challenged payments with the actual

intent to hinder, delay, or defraud any creditor.  Shubert v. Stranahan, 2008 WL

---

[9] Transfers may generally be avoided under § 5104(a)(1) for four years from the date
when the transfer was made.  See 12 Pa.C.S.A. § 5109 (providing that a cause of action is
generally extinguished under § 5104(a)(1) unless the action is brought within four years after
the transfer was made).

17

2370169, at *9 (Bankr. E.D. Pa. April 22, 2008); Burtch v. Harris (In re Harris),
2003 WL 23096966, at *2 (Bankr. D. Del. Dec. 30, 2003).  Since "individuals are
rarely willing to admit intent, actual fraud is rarely proven by direct evidence."
Shubert, 2008 WL 2370169, at *9 (Bankr. E.D. Pa. April 22, 2008).  However,
there are factors, commonly referred to as "badges of fraud," which courts
consider in determining whether fraud as been proven by circumstantial
evidence.  Holber v. Dolchin Slotkin & Todd, P.C. (In re American Rehab &
Physical Therapy, Inc.), 2006 WL 1997431, at *15-16 (Bankr. E.D. Pa. May 18,
2006).

      The PUFTA provides a non-exhaustive list of such factors for use in
determining whether "actual intent" exists under subsection (a) of that statute.
The same factors or badges of fraud are applicable in determining "actual intent"
for purposes of Code §548.  Shubert, 2008 WL 2370169, at *9.

      Section 5104(b) of the PUFTA states:

> In determining actual intent under subsection (a)(1),
> consideration may be given, among other factors, to
> whether:
>
> > (1) the transfer or obligation was to an insider;
>
> > (2) the debtor retained possession or control of
> > the property transferred after the transfer;
>
> > (3) the transfer or obligation was disclosed or
> > concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa.C.S.A. § 5104(b).  A "goodly" number of these factors or badges of fraud

must be proven to support a claim of actual fraud.  See Provident Life and

Accident Insurance Co. v. General Syndicators of America, Managers, Inc., 1997

WL 587288, at *5 (E.D. Pa. Sept. 8, 1997).

In this proceeding, the Trustee presented credible expert testimony that the

Debtor was insolvent when the payments at issue were made which means that

factor number nine supports a finding of actual intent.  The Trustee also sought to

show that the legal services for which the payments at issue were made were

provided to Roy and/or Barbara Hiser as individuals rather than to the Debtor

which is relevant to factor number eight.  However, the Trustee simply did not

carry his burden in this regard.  While the Hisers may have individually owned the

properties upon which the projects at issue were being built, the Trustee did not

establish that Roy Hiser retained O'Brien to do pre-construction/construction work

on behalf himself and his wife rather than the Debtor.[10]  While O'Brien addressed

his invoices to Roy Hiser, he gave a credible explanation for his reason for doing

so.[11]  O'Brien also credibly testified that he only worked for the Debtor or

Shawmont, LLC and never for the Hisers as individuals.  The evidence in the

record to the contrary is simply insufficient to establish otherwise.

---

[10]  O'Brien testified that while the Trustee was attempting to establish that the legal work
which O'Brien performed was for the owner because the developer (the Debtor) would not have
retained O'Brien to perform pre-construction work until after the real property for the project at
issue was purchased, his experience was directly to the contrary.  O'Brien stated:

> You know, the trustee makes a distinction that simply because in
> this case, the developer doesn't own it, the developer can't pay a
> bill.  Well, I've paid - - developers pay me all the time.  They don't
> own property, but they ask for services, get the benefit of those
> services, and incur, therefore, an obligation to pay for their
> services.

Tr. at 145.

[11]  In finding O'Brien's testimony on this issue credible, the Court is neither condoning
nor approving his practice of billing an individual for work performed on behalf of an entity
instead of obtaining individual guarantees from the principals.  The propriety of how O'Brien
bills is simply not relevant to the issue of whether the Trustee has proven actual fraud under
§ 548 or the PUFTA.

Moreover, the Trustee failed to establish any of the other factors or badges of fraud in favor of a finding of actual intent to defraud, hinder or delay. Therefore, the Trustee failed to prove actual fraud under either § 548 or the PUFTA.

### (II) Constructive Fraud

The constructive fraud provision of §548 of the Code states:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> * * *
>
>    (B)   (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
>       (ii)  (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
>       (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
>       (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
>       (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

21

11 U.S.C. § 548.  As the party asserting the claim for constructive fraud, the

Trustee bears the burden of establishing the requisite elements.  Pension

Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer

Corporation Retirement Plan No. 003 (In re Freuhauf Trailer Corporation), 444

F.3d 203, 210-11 (3d Cir. 2006).

Based on the expert testimony which the Trustee offered on the issue of

the Debtor's insolvency, he established the required element under

§ 548(a)(i)(B)(ii)(I).  However, he failed to carry his burden of showing that the

Debtor "received less than a reasonably equivalent value in exchange for such

transfer or obligation[.]" 11 U.S.C. § 548(a)(1)(B)(i).  As stated above, he failed to

establish that the services, for which the Debtor made the payments at issue,

were rendered to the Hisers individually rather than to the Debtor.  Moreover,

there is no evidence that the services were not worth the amount which O'Brien

charged for them.

The constructive fraud subsection in the PUFTA provides:

> **(a) General rule.**– A transfer made or obligation
> incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the
> debtor made the transfer or incurred the obligation:
>
> * * *
>
> (2) without receiving a reasonably equivalent
> value in exchange for the transfer or obligation, and the
> debtor:

22

> (i) was engaged or was about to engage in
> a business or a transaction for which the
> remaining assets of the debtor were
> unreasonably small in relation to the
> business or transaction; or
>
> (ii) intended to incur, or believed or
> reasonably should have believed that the
> debtor would incur, debts beyond the
> debtor's ability to pay as they became due.

12 Pa.C.S.A. § 5104(a).[12]   The burden of proof in constructive fraud cases under

the PUFTA is on the party challenging the transfer which, in this proceeding, is

the Trustee. <u>Fidelity Bond and Mortgage Company v. Brand</u>, 371 B.R. 708, 720-

22 (E.D. Pa. 2007).  Again, the Trustee failed to establish that the Debtor made

the payments at issue "without receiving a reasonably equivalent value in

exchange for" the payments.  Consequently, he did not meet the requirement

under §5201(a)(2) for constructive fraud.

## SUMMARY

For the reasons set forth above, the Trustee did not carry his burden to

establish actual or constructive fraud under § 548 of the Code or the PUFTA.

Accordingly, judgment shall be entered against the Trustee and in favor of

O'Brien.  An order to this effect shall be issued.

Dated: <u>August 5, 2010.</u>

_____
HONORABLE JEAN K. FITZSIMON
United States Bankruptcy Judge

---

[12]  Transfers are subject to attack under12 Pa.C.S.A. § 5104(a)(2) for at least four years
from when the transfers were made.  <u>See</u> 12 Pa.C.S.A. § 5109(2) (limiting time period for
bringing a cause of action under § 5104(a)(2) to four years).

Copies to:

**<u>Plaintiff's Counsel</u>**
D. Andrew Bertorelli, Jr., Esquire
Michael J. Shavel, Esquire
Spector Gadon & Rosen, P.C.
1000 Lenola Road
P.O. Box 1001
Moorestown, NJ  08057

**<u>Defendant's Counsel</u>**
William J. O'Brien, II, Esquire
Manayunk Law Office
4322 Main Street
Philadelphia, PA  19127

**<u>Courtroom Deputy</u>**
Ms. Joan Ranieri